NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| TIM A. FISCHELL, ROBERT E.FISCHELL, and DAVID R. FISCHELL,<br><br>Plaintiffs,<br>v.<br><br>CORDIS CORPORATION,<br><br>Defendant. | Civil Action No. 16-cv-00928 (PGS)<br><br>**MEMORANDUM AND ORDER** |

**SHERIDAN, U.S.D.J.**

This matter comes before the Court on Defendant, Cordis Corporation's motion to dismiss the first amended complaint (ECF No.41).

Facts & Procedural History:

On February 19, 2015 Plaintiffs Tim Fischell, Robert Fischell, David Fischell, and IsoStent, LLC., the company the Fischells founded, (collectively "Plaintiffs") filed the Complaint. On May 14, 2015 Plaintiffs filed the First Amended Complaint in the United States District Court for the District of Western Michigan. The First Amended Complaint ("FAC") alleges: (1) breach of contract (Count I); (2) breach of the implied covenant of good faith and fair dealing (Count II); (3) breach of fiduciary duty (Count III); (4) fraud and fraudulent concealment (Count IV); and (5) unjust enrichment (Count V). (ECF No. 7). On February 22, 2016 the case was transferred to this District, and Defendants now seek dismissal of Plaintiffs' FAC. This action arises out of a patent sub-licensing agreement between the parties.

1

The Parties

Plaintiffs are entrepreneurs who are named inventors on more than 100 patents for medical devices, including coronary stent devices and technology. (ECF No. 7, FAC ¶ 2). Coronary stents are tubes that can be inserted into blood vessels to prevent blockages and constrictions, and are used to prevent heart attacks and other illnesses. (*Id.*) Cordis Corporation ("Defendant"), a subsidiary of Johnson & Johnson ("J & J"), manufactures medical devices including stents catheters.

The 1999 Agreement

In June 1999, Plaintiffs entered into a patent royalty agreement ("1999 Agreement") (FAC, Ex. A) with Defendant. Pursuant to the 1999 Agreement, Plaintiffs assigned Defendant the right to use and sell certain coronary stent patents. Defendant agreed to protect Plaintiffs' intellectual property rights and pay Plaintiffs royalties from products made, sub-licensed, or sold by Defendant that incorporated Plaintiffs' patents and intellectual property. Under the 1999 Agreement, Defendant agreed to pay Plaintiffs 1% of net sales on a country-by-country basis on each product manufactured, used, or sold by Defendant (FAC, Ex. A, ¶ 2.2), and Defendant retained the exclusive right to commence legal action, at its discretion, against entities that potentially infringe any of the "royalty bearing patents" that Plaintiffs had assigned to Defendants. (*Id.* at ¶ 2.12). According to the 1999 Agreement, a "royalty bearing patent" is a patent and patent application owned by Defendant or its affiliates as a result of the Agreement between Defendant and Plaintiffs, and all future patents related to and patents issued from Plaintiffs' patents. (*Id.* at ¶ 1.7). Additionally, Defendant was required to keep records of sales with respect to which a royalty should be payable according to the Agreement, and Defendant is required to send Plaintiffs a

written report of the amount of royalty accrued based on those sales, and then pay Plaintiffs the amount of royalty indicated in the report. (*Id.* at ¶ 2.5).

The 2001 Agreement

In December 2001, the parties entered into an agreement ("2001 Agreement") (FAC, Ex. B), which amended the 1999 Agreement to adjust certain royalty rates, but otherwise left the 1999 Agreement in full effect.

For many years, the 1999 Agreement and 2001 Agreement between Plaintiffs and Defendant were honored. Defendant and/or its sub-licensees Guidant Corporation ("Guidant") and then Abbott Laboratories ("Abbott") made royalty payments to Plaintiffs. Moreover, at various times, Defendant filed infringement actions against manufacturers who had not licensed the Plaintiffs' intellectual property or patents. (FAC ¶ 5). Specifically, from February 2004 to January 2006, Guidant paid Plaintiffs royalties. (FAC ¶ 32-33). In 2006, Guidant sold its cardiology division to Abbott, who then paid royalties to Plaintiffs until 2012. (FAC ¶ 33-34). These royalties amounted to approximately $10-15 million annually. (FAC ¶ 34).

Pertinent Contract Provisions

There are four contract provisions primarily at issue in this case: §2.12, §2.13, §2.2, and §2.5. (FAC, Ex. A). The first is § 2.12, which states:

> 2.12: If either party becomes aware of any product or activity of any third party that involved infringement of any ROYALTY BEARING PATENT, then they shall promptly notify the other party. CORDIS may, in its discretion, take whatever action it believes to be necessary against such third party. If CORDIS elects to take legal action, the FISCHELLS will fully cooperate therewith at CORDIS expense.

(FAC, Ex. A). Plaintiffs claim that Defendant has breached this provision because it failed to pay royalties on certain patents, and failed to compel Abbott to pay royalties, and has not taken legal

action against companies that have infringed on the Plaintiffs' patents. Provision § 2.13 is also at issue here. It states:

> 2.13: As a result of the settlement of a lawsuit or for any other reason CORDIS shall have the right to sublease any of the ROYALTY BEARING PATENTS to a third party as long as the appropriate one (1%) percent ROYALTY is paid to the FISCHELLS in accordance with the terms of the AGREEMENT.

(FAC, Ex. A). Plaintiffs claim that Defendant has breached this provision by not paying the appropriate royalty on sales and use of certain patents. Section 2.13 builds upon Section 2.2 of the contract, which states:

> 2.2: ROYALTY – On a country-by-country basis where a VALID CLAIM of a ROYALTY BEARING PATENT is practiced by CORDIS, for each ROYALTY BEARING PRODUCT manufactured, used, or sold by CORDIS, CORDIS shall pay the FISCHELLS a royalty of one percent (1%) of NET SALES of each ROYALTY BEARING PRODUCT; provided, however, that the royalty shall be paid only once, notwithstanding the number of countries in which such ROYALTY BEARING PRODUCT is manufactured, used or sold. The ROYALTY shall be paid by CORDIS within sixty (60) days after the end of each CALENDAR QUARTER. The payment shall be in the form of three separate checks; i.e., one check each for 1/3 of the total 1% ROYALTY to Robert E. Fischell, David R. Fischell and Tim A. Fischell. All three checks shall be mailed to Dr. Robert E. Fischell . . . .

(FAC, Ex. A). Plaintiffs claim that Defendant has breached this provision by not paying the appropriate royalty rate on valid royalty bearing patents. Section 2.5 of the contract is also at issue. This provision states:

> 2.5: RECORDS – CORDIS shall keep complete and accurate records of sales with respect to which a royalty is payable according to this Agreement, and CORDIS shall render to the FISCHELLS a written report setting forth the amount of royalty accrued based on such sales, and CORDIS shall, upon rendering such report, remit to the FISCHELLS the amount of royalty shown thereby.

(FAC, Ex. A). Plaintiffs claim that Defendant has breached the contract by not providing a report to Plaintiffs listing the royalties they are owed.

The relevant change to the contract in the 2001 Amendment was an amendment to §2.2, which addressed the payment of royalties. (FAC, Ex. B). Section 2.2 of the 2001 Amendment states:

> 2.2: ROYALTIES. The following shall be added to the end of Paragraph 2.2: For the avoidance of doubt, the parties agree that a coated stent that is a ROYALTY BEARING PRODUCT shall be accorded the following royalty payment schedule: First, if the product is coated with heparin alone, or an equivalent anti-thrombogenic coating, it shall have a royalty attached to it of nine-tenths of one percent (0.9%) of NET SALES. Second, if the product is a stent coated with a drug other than heparin, which drug is an anti-restenosis drug such as sirolimus, then the product shall have a royalty attached to it of seven-tenths of one percent (0.7%) of NET SALES. Any stent that is a ROYALTY BEARING PRODUCT and is sold without a drug coating or covered by a claim of a patent having a drug coating claim, shall retain the original royalty of 1.0%. In the event that there are other drug coatings not contemplated by this clause, the Parties agree to negotiate the royalty rate in good faith, beginning with a premise that the premium of the value of the drug shall retain a rate of 0.5% of Net Sales.

(FAC, Ex. B). The amendment changes the rate of certain royalties, but otherwise leaves the 1999 Agreement in full force. (ECF No. 7, ¶ 20).

Failure to Pay or Compel Payment of Abbott Royalties Since 2012

Plaintiffs' allege two different situations that have occurred that give rise to this suit. Plaintiffs first allege that Defendant failed to pay, and failed to compel companies to pay royalties to Plaintiffs, which breached the 1999 and 2001 Agreements. (FAC ¶ 47-53). Sometime between 2006 and 2010, Abbott sold coronary stent devices and technologies to various companies, including to Boston Scientific Corporation ("BSC"), that utilized Plaintiffs' patents. Plaintiffs contend that neither Defendant nor Abbott paid any royalties to Plaintiffs for these sales, and that the amount of royalties from these sales would amount to tens of millions of dollars. (FAC ¶ 35-39). In 2010, Defendant sued BSC in federal court in the District of Delaware for selling stents that infringed upon Plaintiffs' stent patents that Plaintiffs had licensed to Defendant. (FAC ¶ 40). The District of Delaware granted BSC's motion for summary judgment on the ground that the

Fischells' patent rights were exhausted as to BSC. (FAC ¶ 41). According to the Plaintiffs, that Court stated in *dicta* that certain claims of Plaintiff's patent were invalid, and BSC's "Promus" stent did not infringe the asserted patents (this statement is referred to as the "June 2012 Order"). (FAC ¶ 41).

In September 2012, Abbott notified Defendant that based on the June 2012 Order, it would no longer pay royalties for certain coronary stent products. Also around this time, Abbott had stopped paying royalties to Defendant that were owed to Plaintiffs for domestic sales of other coronary stent products (Vision and Xience series). (FAC ¶ 42-43). Abbott also halted paying royalties for its international sales subject to the original Guidant License, even though these were not at issue in the case at the Delaware District Court. (*Id.* at ¶ 44). On December 21, 2012, Coletti, acting on behalf of Cordis, was in touch with Abbott and confirmed that the Vision and Xience stents were considered "royalty-bearing" pass-through patents pursuant to the Guidant License, and that failure to pay Plaintiffs royalties for the sales of these stents amounted to non-compliance with the Guidant License. (FAC, ¶ 45-46). However, according to the complaint, Abbott has failed pay royalties for domestic or foreign sales of the royalty-bearing stents, and Defendant has done little else to compel Abbott to pay. (FAC, ¶ 47-48).

In May 2013, the U.S. Court of Appeals for the Federal Circuit affirmed the Delaware District Court's decision but vacated the Court's statements with respect to the invalidity and the finding of non-infringement regarding Plaintiffs' patents. However, since then, Defendant has failed to compel Abbott to pay royalties owed to Plaintiffs under the 1999 Agreement. Moreover, Defendant has also failed to pay royalties to Plaintiffs for Abbott's use and sale of stent products under the Guidant License. (FAC ¶ 49-51).

Plaintiffs also allege that Defendant has failed to provide them with reports detailing the amount of royalties owed, which violates the 1999 Agreement. (FAC ¶ 52).

Failure to Pay Pre-2004 Royalties

In late 2002 or early 2003, Plaintiffs informed a representative of Cordis, Paul Coletti ("Coletti"), that they believed certain stents that Guidant manufactured and sold likely infringed Plaintiffs' patents. (FAC ¶ 21). In January 2004, approximately one year later, Coletti informed Plaintiffs that Guidant and Cordis had entered into an agreement regarding this infringement, and Guidant agreed to pay royalties to Cordis to "pass-through" to Plaintiffs going forward (February 2004 Settlement & Release Agreement, "Guidant License").

Pursuant to this February 2004 Agreement, Defendant sub-licensed particular patents of Plaintiffs to Guidant. (FAC ¶ 26). When Plaintiffs asked whether they would receive payments from Guidant for the patents used prior to the agreement between Defendant and Guidant, Defendant indicated that it had released Guidant from the obligation to pay for stents sold prior to the February 2004 Guidant License. (FAC ¶ 27).

Plaintiffs, however, assert that Defendant and Guidant actually agreed that Defendant would be responsible for paying royalties to Plaintiffs for sales prior to February 2004. (FAC ¶ 25). At that same time, Plaintiffs requested a copy of the Guidant License from Coletti. Coletti denied the request for the entire license, but sent over a page excerpted from the Guidant License that confirmed that any pass-through royalties payable to Plaintiffs from Guidant through Defendant would be paid by Guidant after the execution of the Guidant License, and any royalties from sales prior to the Guidant License would be waived. (FAC, Ex. C). Plaintiffs assert that they relied on this communication and did not attempt to access the full and complete Guidant License,

or pursue payments or royalties from pre-February 2004 sales. Plaintiffs believe that royalties from these sales would have totaled at least $25 million dollars (FAC ¶ 30-31).

In 2012, Plaintiffs asked Defendant for a copy of the Guidant License, which Defendant declined to provide, due to "confidentiality concerns." (FAC, ¶ 54-55). Defendant only gave Plaintiffs an excerpt of the Guidant License. However, in 2013, Plaintiffs reviewed a copy of the Guidant License, which had been filed with the SEC, for the first time. (FAC, ¶ 56). The provision of the Guidant License regarding pass-through royalties, Section 2(d) reads as follows:

> A New Section 2.9A is added as follows: 2.9A <u>Fischell Patents</u>. CORDIS hereby grants to GUIDANT an irrevocable, non-exclusive, worldwide right and license (without the right to sublicense) to make, have made, use or sell, or otherwise dispose of Licensed Products under the Fischell Patents in all fields, and to practice processes and methods under the Fischell Patents in all fields. The license granted pursuant to this Section 2.9A shall be paid-up as to J&J. Any pass-through royalties payable with respect to Net Sales by GUIDANT of Licensed Products, including future Licensed Products (i) after the date of execution of this Agreement shall be payable by GUIDANT *and (ii) prior to the date of execution of this Agreement shall be waived and, if payable, paid by CORDIS.* (CORDIS represents that, unless noted on Schedule 1L, the pass-through royalty rate is [***]. Payments under this Section 2.9A shall be made by GUIDANT to CORDIS, which shall then forward such payments as part of its contractual obligations.

(FAC, Ex. F) (italicizes added). After reviewing the Guidant License, Plaintiffs claim that Defendant had misrepresented the terms of the royalty agreement, which Plaintiffs claim cost them at least $25 million. (FAC, ¶ 57-60).

Both alone and together, these two situations form the basis of Plaintiffs' claims in this suit.

<u>Plaintiffs' Claims in this Suit</u>

Plaintiff's commenced this action as a result of Defendant's alleged: (1) failure to pay royalties for pre-February 2004 sales of patent-bearing stents; (2) misrepresentation of the terms of the Guidant License; and (3) failure to compel Abbott to pay royalties for their use, manufacture,

and sale of stent products in violation of the 1999 Agreement and Guidant License. Plaintiffs seek damages of at least $65 million, and punitive damages.

Defendants contend that Plaintiff's Complaint fails to state a claim and seek dismissal of same.

Motion to Dismiss pursuant to 12(b)(6)

On a motion to dismiss for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6), the Court is required to accept as true all allegations in the Complaint and all reasonable inferences that can be drawn therefrom, and to view them in the light most favorable to the non-moving party. *See Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1384 (3d Cir. 1994). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)). While a court will accept well-pleaded allegations as true for the purposes of the motion, it will not accept bald assertions, unsupported conclusions, unwarranted inferences, or sweeping legal conclusions cast in the form of factual allegations. *Iqbal*, 556 U.S. at 678-79; *see also Morse v. Lower Merion School District*, 132 F.3d 902, 906 (3d Cir. 1997). The pertinent question is whether the claimant can prove any set of facts consistent with his or her allegations that will entitle him or her to relief, not whether that person will ultimately prevail. *Semerenko v. Cendant Corp.*, 223 F.3d 165, 173 (3d Cir.), *cert. denied, Forbes v. Semerenko*, 531 U.S. 1149, 121 S. Ct. 1091 (2001). "The pleader is required to 'set forth sufficient information to outline the elements of his claim or to permit inferences to be drawn that these elements exist.'" *Kost v. Kozakewicz*, 1 F.3d 176, 183 (3d Cir. 1993) (quoting 5A Wright & Miller, Fed. Practice & Procedure: Civil 2d § 1357 at 340). A complaint should be dismissed only if the well-pleaded alleged facts, taken as true, fail to state a

claim. *See In re Warfarin Sodium*, 214 F.3d 395, 397-98 (3d Cir. 2000). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do, . . . . Factual allegations must be enough to raise a right to relief above the speculative level, . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact), . . . ." *Twombly*, 550 U.S. at 555, 127 S. Ct. at 1964-65 (internal citations and quotations omitted).

Count I – Breach of Contract

Plaintiffs contend that Defendant breached its contract, the June 1999 Agreement and 2001 Agreement, when it: (1) failed to pay or compel the payment of royalties to Plaintiffs for the foreign sales of Abbott's stent products that used Plaintiffs' patents; (2) failed to pay or compel the payment of royalties to Plaintiffs for Abbott's U.S. sales of specific stents that use Plaintiffs' patents; (3) failed to pay or compel the payment of royalties to Plaintiffs for Abbott's sales to BSC and other companies; and (4) failed to deliver a written report to Plaintiffs detailing the amount of royalties owed to Plaintiffs based on sales of royalty-bearing patents. (FAC, ¶ 64-66). Defendants assert that there was no breach of the 1999 Agreement because Defendant had complete discretion over whether to take action against a third-party for possible infringement, and that Plaintiffs do not adequately detail which sections of the contract were breached.

In New Jersey, there are four elements to a breach of contract claim that the pleader must demonstrate: (1) a contract; (2) a breach of that contract; (3) damages resulting from that breach; and (4) that the party performed its own contractual duties. *Video Pipeline v. Buena Vista Home Entertainment, Inc.*, 210 F. Supp. 2d 552, 561 (D.N.J. 2002) (internal citations omitted).

In reviewing the First Amended Complaint, the Court finds that Plaintiffs have stated a plausible claim for breach of contract. Plaintiffs assert the existence of a contract by alleging that, "[i]n June 1999, the Fischells entered into a patent royalty agreement with Cordis regarding certain of the Fischells' medical device patents." (FAC ¶ 4). According to this contract, Defendant promised "to pay the Fischells royalties for products made, sold, or sub-licensed by Cordis that incorporated the Fischells' patents and other intellectual property, among other promises." (*Id.*). Plaintiffs allege further that Defendant was obligated to "keep complete and accurate records of sales with respect to which a royalty is payable according to this Agreement." (FAC ¶ 19). Therefore, Plaintiffs have adequately alleged that a contract existed, and the provisions of which Defendant breached.

Plaintiffs have also adequately alleged breach of the 1999 Agreement. Specifically, Plaintiffs assert Defendant breached the agreement when Defendant's sub-licensee halted royalty payments to Plaintiffs, and Defendant did little to compel the sub-licensee to pay the royalties. (FAC ¶ 6). Moreover, Plaintiffs aver that, "[i]n addition to failing to pay or compel payment of royalties…Cordis has failed to provide the Fischells with written reports setting forth the amount of royalties accrued and payable based on sales of royalty-bearing stents, as required by the June 1999 Agreement." (FAC ¶ 52). As such, Plaintiffs have adequately alleged that Defendant breached the 1999 Agreement.

Lastly, Plaintiffs assert that damages have resulted from Defendant's breach of contract by alleging that, "Cordis's failure to compel Abbott to pay royalties, or to itself pay the royalties owed to Plaintiffs, has so far deprived Plaintiffs of in excess of $20 million due to them for that one royalty stream alone." (FAC ¶ 6). Plaintiffs allege further that royalty payments from "Guidant's

pre-February 2004 sales of royalty-bearing stents would have totaled not less than $25 million." (FAC ¶ 31).

Accordingly, Plaintiffs have alleged that a contract exists between the parties, Defendants breached that contract, and damages result from that breach. Therefore, Plaintiffs have set forth a plausible claim for breach of contract, and Defendant's Motion to Dismiss Count I is DENIED.

### Count II – Breach of Implied Covenant of Good Faith and Fair Dealing

Plaintiffs allege that Defendant breached the implied covenant of good faith and fair dealing by "actively concealing the fact that it deprived Plaintiffs of pre-2004 patent royalties for stent products manufactured by Guidant in order to gain access to Guidant's rapid-exchange balloon catheter technology." (FAC ¶ 76). Plaintiffs also assert that Defendant acted in bad faith when it failed to pay or "compel Abbott to pay royalties for its sales of stents – including sales to BSC and others – that practice at least one claim of the '856 patent and other patents assigned to Cordis, despite the validity of those patents and Plaintiffs' repeated requests that Cordis do so." *Id.* Defendant counter Plaintiffs have not sufficiently plead that defendant acted with an improper motive. Defendant further maintains that "[t]rue or false, a motive of increased sales is not one intended to intentionally injure the Fischells or destroy their expectations." (ECF No. 41-1 at 17). Defendant also asserts that Plaintiffs failed to allege that any of Defendant's actions were "outside the range of risks" the Fischells assumed under the 1999 Agreement. (ECF No. 41-1 at 17).

Under New Jersey law, "a covenant of good faith and fair dealing is implied in every contract." *Sons of Thunder, Inc. v. Borden, Inc.*, 148 N.J. 396, 420 (1997). "A plaintiff may be entitled to relief in an action under the covenant [of good faith and fair dealing] if the defendant acts with ill motives and without any legitimate purpose to destroy the plaintiff's reasonable expectations. However, bad motive or intention is essential, and an allegation of bad faith or unfair

12

dealing should not be permitted to be advanced in the abstract and absent improper motive." *Hassler v. Sovereign Bank*, 644 F.Supp.2d 509, 518 (D.N.J. 2009) (quoting *Elliot & Frantz, Inc. v. Ingersoll-Rand Co.*, 457 F.3d 312, 329 (3d Cir. 2006)).

In reviewing the allegations of the Complaint, the Court finds that Plaintiffs have sufficiently pled the claim of breach of the implied covenant of good faith and fair dealing. At the pleading stage, allegations of bad faith are sufficient to withstand the motion to dismiss. *See Alin v. American Honda Motor Co.*, 2010 WL 1372308, *11 (D.N.J. Mar. 31, 2010); *see also Seidenberg v. Summit Bank*, 348 N.J.Super. 243, 791 A.2d. 1068 (App. Div. 2002). Here, Plaintiffs' allegations are not in the abstract, but instead Plaintiffs have sufficiently alleged that Defendant acted in bad faith when it failed to compel certain royalty payments from third parties. The Court is unpersuaded by Defendant's argument that any action taken by Defendant was within the risk of the contract, as this is a fact question that is not ripe for determination at the pleading stage. Because Plaintiffs have adequately alleged bad faith, they have stated a plausible claim for breach of the covenant of good faith and fair dealing. As such, Defendant's motion to dismiss this Count is denied.

<u>Count III – Breach of Fiduciary Duty</u>

Defendant asserts that there were no fiduciary obligations between the parties because the transaction was an ordinary arms-length commercial transaction. Defendant also contends that Plaintiffs' claim for breach of fiduciary duty is barred by the economic loss doctrine. The essence of a fiduciary relationship is that one party places trust and confidence in another who is in a dominant or superior position. *F.G. v. MacDonell*, 150 N.J. 550, 563 (1997). A fiduciary relationship arises between two persons when one person is under a duty to act for or give advice for the benefit of another on matters within the scope of their relationship. *Restatement (Second)*

13

*of Torts* § 874 cmt. a (1979); *see In re Stroming's Will*, 12 *N.J. Super.* 217, 224 (App. Div.), *certif. denied*, 8 N.J. 319 (1951) (stating essentials of confidential relationship "are a reposed confidence and the dominant and controlling position of the beneficiary of the transaction"). However, there is typically no fiduciary relationship present in an arms-length commercial transaction or sale. *See Estate of Maglione v. Gulf Oil Corp.*, 2007 WL 527940 at *5 (App. Div. 2008) (finding no duty to disclose existed because the sale was an arms-length commercial transaction and no fiduciary relationship existed); *see also Skelcy v. UnitedHealth Group, Inc.*, 2012 WL 6087492 at *8 (D.N.J. Dec. 6, 2012) (finding that the parties "were in the position of regular contracting parties; no fiduciary relationship existed.").

Plaintiffs argue that the parties were in a fiduciary relationship because, pursuant to the 1999 and 2001 Agreements, "Plaintiffs gave Cordis the exclusive right to own, use, and control certain of Plaintiffs' patents in exchange for Cordis's promise to pay royalties on the Net Sales of all royalty-bearing stents made, sold, or licensed by Cordis, among other promises." (FAC ¶ 81). Additionally, Plaintiffs assert that "[b]y virtue of Cordis's unfettered discretion to license Plaintiffs' patents, Cordis assumed fiduciary duties to Plaintiffs." (FAC ¶ 83). Finally, Plaintiffs state that "Cordis has acted intentionally, willfully, maliciously, and in bad faith, including by actively concealing evidence of its self-dealing at Plaintiffs' expense." (FAC ¶ 86).

Here, the Court finds that, in reviewing the Complaint as a whole, there is nothing to indicate there was a fiduciary relationship between the parties. There are no facts in the Complaint showing that the parties had unequal bargaining power, or that Defendant was in a dominant position over Plaintiffs. Instead, the Complaint indicates that both parties are sophisticated business people. Indeed, Plaintiffs describe themselves as "leading innovators in the stent technology field" and "named on greater than forty U.S. patents for coronary stents and stent

delivery systems alone." (FAC ¶ 14). Accordingly, in reviewing the Complaint, the Court finds that the relationship of the parties is that of an arms-length commercial transaction, not a fiduciary. Therefore, Defendant's Motion to Dismiss this Count III is granted, and the breach of fiduciary duty claim is dismissed.

<u>Count IV – Fraud and Fraudulent Concealment ("Inducement")</u>

Defendants contend that Plaintiffs' claim for fraud: (1) is not pleaded with the required particularity under Fed. R. Civ. P. 9(b); (2) that the alleged misrepresentations would not have been material; (3) that the Plaintiffs did not sufficiently argue that they relied on the alleged misrepresentations; (4) and that the fraud claim is barred by the economic loss doctrine because it arises from the contract between the parties.

In order to state a claim for common law fraud in New Jersey, a plaintiff must allege "(1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages. *Gennari v. Weichert Co. Realtors*, 148 N.J. 582, 610, 691 A.2d 350 (N.J. 1997) (citing *Jewish Ctr. of Sussex Cnty. v. Whale*, 86 N.J. 619, 624-25, 432 A.2d 521 (N.J. 1981)). An allegation of fraud is subject to heightened pleading standards. Pursuant to Fed. R. Civ. P. 9(b), "in alleging fraud or mistake, a party must state with particularity the circumstances constituting the fraud or mistake." A complaint can satisfy Rule 9(b) if it "describes the circumstances of the alleged fraud with precise allegations of date, time or place." *Naporano Iron & Metal Co. v. Am. Crane Corp.*, 79 F. Supp. 2d 494, 511 (D.N.J. 1999) (internal citations omitted). Generally "to satisfy this heightened standard, the plaintiff must plead or allege the date, time, and place of the alleged fraud or otherwise inject precision or some measure of

substantiation into a fraud allegation" (*Frederico v. Home Depot*, 507 F.3d 188, 200 (3d. Cir. 2007) (internal citations omitted).

However, "[t]he economic loss doctrine prohibits plaintiffs from recovering in tort economic losses to which their entitlement only flows from contract." *Chen v. HD Dimension, Corp.* 2010 WL 4721514 at *8 (D.N.J. Nov. 15, 2010). Essentially, the economic loss doctrine functions to eliminate recovery on "a contract claim in tort claim clothing." *SRC Constr. Corp. v. Atl. City Hous. Auth.*, 935 F.Supp.2d 796, 801 (D.N.J. 2013). Therefore, "if through its tort claim, a plaintiff simply seeks to enhance the benefit of the bargain [it] contracted for, (quoting the economic loss doctrine applies. If, however, a plaintiff asserts that a defendant breached a duty owed to the plaintiff that is independent of the duties that arose under the contract the economic loss doctrine does not apply." *G&F Graphic Services, Inc. v. Graphic Innovators, Inc.*, 18 F.Supp.3d 583, 588-89 (D.N.J. 2014) (citing *Saltiel v. GSI Consultants, Inc.*, 170 N.J. 297, 310-317 (2002)). Defendants contend that Plaintiff's fraud claims are seeking to redress contract claims under a tort theory, and therefore are barred under the economic loss doctrine.

However, a well-settled exception to the economic loss doctrine is fraud in the inducement of a contract. "The distinction between fraud in the inducement and fraud in the performance of a contract remains relevant to the application of the economic loss doctrine in New Jersey." *Bracco Diagnostics, Inc. v. Bergen Brunswig Drug Co.*, 225 F.Supp.2d 557, 563 (D.N.J. 2002). The distinction lies "between a misrepresentation of a statement of intent at the time of contracting, which then induces detrimental reliance on the part of the promisee, and the subsequent failure of the promisor to do what he has promised." (*Id.*) (internal citation omitted). Therefore, New Jersey case law has "permitted a fraud claim to proceed with a breach of contract claim generally appear to have involved a fraud in the inducement of a contract or an analogous situation based on pre-

contractual misrepresentations." *Id.* (internal citation omitted). The threshold question is regarding the economic loss doctrine's applicability to fraud and contract claims plead together "is whether the allegedly tortious conduct is extraneous to the contract." *Id.* at 564 (internal citation omitted).

Here, Plaintiffs assert that Defendant materially misrepresented that Defendant and Guidant had agreed that Defendant would be responsible for paying royalties to Plaintiffs for sales before February, 2004. (FAC, ¶ 92). Furthermore, Plaintiffs contend that Defendant and its representative, Coletti, continuously misled Plaintiffs in refusing to provide Plaintiffs with a full copy of the Guidant License with the terms of the royalty agreement between Defendant and Guidant, and that Plaintiffs relied on Defendant's misrepresentations. (FAC, ¶ 89-102). Specifically, Plaintiffs state that from January 24 to January 28, Defendant informed Plaintiffs of the Guidant License, but misrepresented which party would be responsible for paying the pass-through royalties to Plaintiffs. (FAC, ¶ 91-93). Plaintiffs also allege that on February 22, 2004, Coletti sent Plaintiffs an agreement that misrepresented the status of the pass-through royalties. (FAC ¶ 29). Plaintiffs attest that in relying on Defendant's representations about the pre-February 2004 royalties, "Plaintiffs made no further attempts to acquire a complete copy of the Guidant License from Cordis or to pursue royalties from Cordis or Guidant for Guidant's pre-February 2004 sales of royalty-bearing stents." (FAC ¶ 30).

Here, Plaintiffs assert that Defendant materially misrepresented that Defendant and Guidant had agreed that Defendant would be responsible for paying royalties to Plaintiffs for sales before February, 2004. (FAC, ¶ 92). Furthermore, Plaintiffs contend that Defendant and its representative, Coletti, continuously misled Plaintiffs in refusing to provide Plaintiffs with a full copy of the Guidant License with the terms of the royalty agreement between Defendant and

Guidant, and that Plaintiffs relied on Defendant's misrepresentations. (FAC, ¶ 89-102). Specifically, Plaintiffs state that from January 24 to January 28, Defendant informed Plaintiffs of the Guidant License, but misrepresented which party would be responsible for paying the pass-through royalties to Plaintiffs. (FAC, ¶ 91-93). Plaintiffs also allege that on February 22, 2004, Coletti sent Plaintiffs an agreement that misrepresented the status of the pass-through royalties. (FAC ¶ 29). Plaintiffs attest that in relying on Defendant's representations about the pre-February 2004 royalties, "Plaintiffs made no further attempts to acquire a complete copy of the Guidant License from Cordis or to pursue royalties from Cordis or Guidant for Guidant's pre-February 2004 sales of royalty-bearing stents." (FAC ¶ 30).

Moreover, Plaintiffs have also alleged a claim for "fraudulent concealment" (as alleged in the Complaint), but also refer to this claim as one for "fraudulent inducement" in their opposition papers. As with Plaintiffs' common law fraud claim, Defendants contend that it fails to meet heightened pleading and is barred by the economic loss doctrine.

"In order to establish a claim for fraudulent inducement under New Jersey law, the following elements must be proven: (1) a material representation of a presently existing or past fact; (2) made with no knowledge of its falsity; and (3) with the intention that the other party rely thereon; (4) resulting in reliance by that party; (5) to his detriment." *RNC Sys., Inc. v. Modern Tech. Grp., Inc.*, 861 F. Supp. 2d 436, 451 (D.N.J. 2012) (internal citations omitted). "Fraud requires clear and convincing proof." *McConkey v. AON Corp.*, 354 N.J. Super. 25, 45-46 (App. Div. 2002). However, "a plaintiff may be permitted to proceed with tort claims sounding fraud in the inducement so long as the underlying allegations involve misrepresentations unrelated to the performance of the contract, but rather precede the actual commencement of the agreement." *Chen v. HD Dimension, Corp.* 2010 WL 4721514 at *8 (D.N.J. Nov. 15, 2010).

18

Here, the Court finds that the alleged fraud occurred after the contract between Plaintiffs and Defendant was entered. Thus, the economic loss doctrine prohibits the claim. The Defendant's motion to dismiss this Count is granted. The Court notes, but makes no ruling, that some of these facts may concern a breach of duty of good faith and fair dealing. The Plaintiff may amend the Complaint

### Count V – Unjust Enrichment

Plaintiffs also request that they be allowed to plead unjust enrichment in the alternative to their cause of action for the breach of contract claim. "The doctrine of unjust enrichment rests on the equitable principle that a person shall not be allowed to enrich himself unjustly at the expense of another." *Goldsmith v. Camden Cnty. Surrogate's Office*, 408 N.J. Super. 376, 382 (App. Div. 2009). "A cause of action for unjust enrichment requires proof that 'defendant[s] received a benefit and that retention of that benefit without payment would be unjust." *Id.* at 382. Moreover, "[u]njust enrichment is not an independent theory of liability, but is the basis for a claim of quasi-contractual liability." *Id.* at 382. However, "A quasi-contract claim cannot exist when there is an enforceable agreement between parties." *MK Strategies, LLC v. Ann Taylor Stores Corp.*, 567 F.Supp.2d 729, 733-34 (D.N.J. 2008) (citing *Callano v. Oakwood Park Homes Corp.*, 91 N.J. Super. 105 (App. Div. 1966)).

Here, the parties do not dispute that the contract in question was a valid agreement, and Defendant argues that because there was a valid and enforceable contract, a separate claim for unjust enrichment should not be allowed. (ECF No. 41). However, at the pleading stage it would be unnecessary to dismiss a claim that might be pled in the alternative. *See Palmeri v. LG Electronics USA, Inc.* 2008 WL 294585 (D.N.J. July 30, 2008) (declined to dismiss claim of unjust enrichment under New Jersey law where plaintiff pled in the alternative to recover on a contract);

19

*see also, CDK Global, LLC. v. Tulley Automotive Grp., Inc.,* 2016 WL 1718100 at *7 (D.N.J. April 29, 2016) ("[A]t the pleading stage, dismissal of an unjust enrichment claim because it might turn out to be superfluous would be premature"). Thus, the Court will allow the claim for unjust enrichment to proceed, since it is just the pleading stage. The motion to dismiss is denied on this count.

## ORDER

For the reasons set forth above,

IT IS on this 26th day of September, 2016;

ORDERED that Defendant's motion to dismiss is denied on Counts I, II, and V; and it is further

ORDERED that Defendant's motion to dismiss is granted on Count III and Count IV.

_____
PETER G. SHERIDAN, U.S.D.J.